## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| **TRACIE KOLAR,** | ) | |
| | ) | **No. 13 CV 6011** |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **Magistrate Judge Maria Valdez** |
| **CAROLYN W. COLVIN, Acting** | ) | |
| **Commissioner of the U.S. Social** | ) | |
| **Security Administration,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Tracie Lynn Kolar seeks judicial review under 42 U.S.C. § 405(g) of a final decision of Defendant Commissioner of the Social Security Administration ("SSA") denying her claim for Social Security Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("the Act"). *See* 42 U.S.C.S. §§ 416 and 423. The parties have consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). Before the court is Plaintiff's Motion for summary judgment [15]. For the reasons that follow, Plaintiff's motion is denied.

## BACKGROUND

### I.     PROCEDURAL HISTORY

On March 16, 2010, Plaintiff filed a Title II DIB application alleging a disability onset date of May 1, 2008. (R. 123-24, 176.) Her initial claim was denied on July 28, 2010 and again upon reconsideration on November 17, 2010. (R. 70, 78.) After both denials, Plaintiff filed a hearing request on December 21, 2010 pursuant

to 20 C.F.R. § 404.929 *et seq.* (R. 84.) A hearing was scheduled on October 19, 2011 but due to family obligations, Plaintiff was unable to attend. (R. 93, 237-38.) The hearing was rescheduled for January 11, 2012. (R. 113.) On that day, Plaintiff appeared, along with her representative Jim Brown, and testified before Administrative Law Judge ("ALJ") Janice M. Bruning. (R. 34-62.) Vocational Expert ("VE") Glee Ann Kehr was also present and offered testimony. Id.

## II.   FACTUAL BACKGROUND

### A.   Background

Claimant was born on April 19, 1969 and was 40 years-old at the time of her DIB application. (R. 172.) She completed high school and two years of college in 1990. (R. 177.) She is married and lives with her husband in Oswego, IL. (R. 175.) She does not have any children. (R. 37.) Plaintiff held various administrative positions in the last 15 years. (R. 189.) From 1997 through 1998, she was an administrative representative at a collision center. (R. 190.) From 1998 through 2001, Plaintiff was a controller assistant for an engineering firm. (R. 191.) From 2001 through 2005, she was a staff associate for an accounting firm. (R. 192.) From 2005 through 2007, Plaintiff was an administrative assistant for a landscape company. (R. 193.) Plaintiff was a staff accountant from 2007 through 2008 at an accounting firm. She stopped working in May 2008. (R. 176.)

### B.   Medical Evidence

Much of the medical evidence presented by Plaintiff consisted of records of treatment prior to her alleged onset date of May 1, 2008. Plaintiff has been a patient of the Pain Specialists of Greater Chicago since April 2003. (R. 681.) At her first consultation, she complained chiefly of bilateral headaches and neck pains that radiated to her shoulders. *Id.* She was diagnosed with cervical facet arthropathy and myofascial pain syndrome. *Id.* On April 10, 2003, an MRI of the cervical spine was performed and Plaintiff was diagnosed with early cervical spondylosis at C5-6 and C6-7. (R. 722.) There was no evidence of disc herniation or high-grade stenosis. *Id.* On March 23, 2004, Plaintiff saw Dr. Douglas L. Johnson, M.D. at the request of Plaintiff's treating physician, Dr. Ira Goodman ("Goodman"). (R. 697-98.) Another MRI was taken and Dr. Johnson found abnormal movement in the cervical spine with Plaintiff. (R. 697.) Dr. Johnson concluded that surgical intervention would not be necessary for Plaintiff's pains. (R. 698.)

In April 2003, at the request of Dr. Goodman, Plaintiff received injections of depo-medrol and marcaine into joints of her cervical spine. (R. 674.) Dr. Goodman noted that Plaintiff tolerated the procedure well and that her discharge pain score was reduced to two out of ten. *Id.* The same procedure was performed in May, August, and September 2003 and in March, April, and November 2010. (R. 256, 257, 653, 654, 671.) Again, Plaintiff tolerated the procedures well and was discharged without difficulty. *Id.*

On January 10, 2005, Plaintiff started physical therapy at Newsome Physical Therapy Center. (R. 633.) Plaintiff complained of chronic neck pain during physical therapy. *Id.* She continued her physical therapy sessions throughout 2005. Her physicians suggested that Plaintiff continue her sessions at two or three times a week. *Id.* However, on November 28, 2005, Newsome informed Dr. Goodman that Plaintiff had stopped attending her physical therapy sessions due to illness. (R. 624.) The records do not indicate that Plaintiff returned for additional physical therapy sessions.

In May 2005, Plaintiff had a pre-surgical psychological screening evaluation at Clinical & Health Psychologists prior to an implantation of an occipital neural stimulator. (R. 693-96.) During the evaluation, Plaintiff stated that her pain has kept her from physical activities. (R. 694.) Plaintiff did not report any headaches or mental health treatment. *Id.* She denied any symptoms of depression or anxiety. *Id.* Plaintiff was deemed fit to have the stimulator implantation, which both parties agree later took place.[1] (R. 696.)

Plaintiff has been a patient of Dr. Jessie K. Park, M.D. since December 2007. (R. 323.) Dr. Park treated Plaintiff for her myofascial pain and severe migraines. (R. 298, 305.) Plaintiff visited Dr. Park several times through November 2011. (R. 880-896.) During her visits, Plaintiff reported severe body pains and headaches. Id. Dr.

---

[1]  In their briefs, both Plaintiff and Defendant asserted that the pain stimulator implantation was performed in 2003. However, there are no medical records on file to corroborate this. The only reference to the pain stimulator is the pre-surgical evaluation performed in 2005.

Park prescribed medication for Plaintiff's pain and insomnia. (R. 294, 300, 304, 309, 310, 311, 889, 894.) On November 2, 2009, Plaintiff was advised by Dr. Park to visit psychologist Kathy Borchardt regarding depression. (R. 857-858.) Dr. Borchardt found that Plaintiff suffered from chronic lower back pain, myofascial syndrome, and headaches. She further noted that therapy and medication did not alleviate the pain completely and that Plaintiff's pain markedly impacted her ability to sustain concentration and attention. (R. 858.) Furthermore, Dr. Borchardt stated that Plaintiff is unable to function in a competitive work setting and her pain would increase if she were to return to work. *Id.* Plaintiff continued to visit Dr. Borchardt for psychotherapy on a weekly basis. (R. 865.)

In June 2010, with the recommendation of Dr. Park, an ultrasound was performed to review Plaintiff's renal artery stenosis. (R. 396.) The ultrasound showed no evidence of renal artery stenosis and showed that Plaintiff's renal resistive indices were normal. *Id.* In September 2010, Plaintiff visited rheumatologist Dr. Rediet Kokbie. (R. 827-828.) After the examination, Dr. Kokbie diagnosed Plaintiff with fibromyalgia and concluded that Plaintiff's exam results were consistent with chronic pain, fibromyalgia, and myofascial syndrome. (R. 828.)

Also in June 2010, Dr. Joseph Martin Nemeth, M.D. performed a psychiatric evaluation and concluded that Plaintiff had severe neck, head, shoulder, and back pain. (R. 419-20.) He diagnosed Plaintiff with adjustment disorder secondary to her medical condition. (R. 420.) On July 20, 2010, clinical psychologist Howard Tin

performed a psychiatric review, and also concluded that Plaintiff had adjustment disorder secondary to her general medical condition. (R. 421-34, 426.) Dr. Tin found that Plaintiff had mild restrictions in activities of daily living and maintaining concentration, persistence, and pace. (R. 431.) She was not limited in her ability to maintain social functioning and did not show episodes of decompensation. *Id.*

On July 26, 2010, Dr. Virgilio Pilapil M.D. completed an RFC assessment of Plaintiff after reviewing Plaintiff's records. Dr. Pilapil found that Plaintiff could lift 50 pounds occasionally and 25 pounds frequently. He also determined that Plaintiff could stand or walk about six hours in an eight hour workday, sit for a total of six hours in an eight hour workday, and push and pull without any limitation. (R. 436.) Dr. Pilapil did not note any manipulative, communicative, environmental, or visual limitations in his evaluation. (R. 438-39.) Dr. Pilapil concluded that Plaintiff had a diagnosis of cephalgia with pain associated with shoulder and neck movements. *Id.* Dr. Pilapil noted that Plaintiff's records did not demonstrate joint swelling, redness, or tenderness, and that they demonstrated that Plaintiff had full motor functioning and grip strength, along with a slight limitation of movement in her neck, with "no other remarkable findings." (R. 442.)

### C.   **Plaintiff's Testimony**

At the hearing, Plaintiff testified that she experienced pain from her lower shoulder blade up through the top of her head. (R. 40.) Plaintiff described the pain as dull and achy. *Id.* When asked to scale the pain from one to ten, ten being the

most painful, Plaintiff stated that the pain level was at an eight. *Id.* Plaintiff stated that she regularly took pain medication. (R. 41.) She stated that her dosage of certain medications was raised the month before the hearing to accommodate the increasing pain. *Id.* Plaintiff stated that she also had a pain stimulator implant that helps to alleviate some of the pain but is not always effective. (R. 51.) Plaintiff further stated that she finds it difficult to make plans with friends and family because she often cancels due to the pain. (R. 52.) She also had trouble concentrating while taking the medication. *Id.* Plaintiff stated that she experiences muscle spasms frequently, so she limits the amount of her physical activity. *Id.* Plaintiff further testified that she has been seeing Dr. Kathy Borchardt, a mental health specialist, for over a year, and currently sees her bi-weekly. *Id.* Plaintiff stated that she experiences low self-esteem, difficulty concentrating, thinking, and focusing. *Id.*

With regard to her physical abilities, Plaintiff testified that she could walk a block or a block and a half before the pain returns. (R. 42-43.) She can stand on her feet for about 15 or 20 minutes but she cannot stand on hard surfaces for long periods of time. (R. 43.) Plaintiff can sit for 25 minutes before needing to stand up from pain. *Id.* Plaintiff further testified that she could not lift a gallon of milk. *Id.* She does not have difficulty climbing stairs but has trouble bending, stooping, crouching, crawling, and kneeling. *Id.* Plaintiff stated that she has difficulty

reaching overhead with her right arm and has difficulty holding items in her hand. *Id.* She believed that this became an issue a few months ago. *Id.*

With regard to her daily activities, Plaintiff testified that she had trouble sleeping through the night. (R. 45.) She has significant pain and required medication a few times in the evening. *Id.* Plaintiff stated that she will wake up in the middle of the night at least two or three times. *Id.* During a typical night, Plaintiff sleeps six hours. *Id.* She takes naps throughout the day for about an hour and a half to two hours. *Id.* Plaintiff has difficulty showering because of the pain. *Id.* She drives twice a month and can prepare simple meals for herself. (R. 46.) She does not go the grocery store and has not gone for a few years. *Id.* She stopped going to the grocery store because she had trouble carrying the items, pushing the shopping cart, and loading the items into her car. *Id.* She does not do household chores such as washing or drying the dishes. (R. 47.) Plaintiff stated that she cannot do laundry because she cannot lift the clothes or load the machines. *Id.* Plaintiff further testified that she does not make the bed, vacuum, or take out the garbage. *Id.* In her spare time, Plaintiff likes to scrapbook and play computer card games. (R. 48.) She does not belong to any church or community organization and does not often go out for leisure. *Id.*

### D. <u>Vocational Expert Testimony</u>

VE Glee Ann Kehr was present and testified at the hearing. (R. 54-59.) The VE described Plaintiff's relevant past experience as an accounting clerk and an

insurance claims clerk, both of which are skilled jobs and sedentary in nature. (R. 55.) The ALJ asked the VE whether an individual of Plaintiff's age, education, and work experience, who can lift 50 pounds occasionally, 25 pounds frequently, stand and walk a total of six hours during an eight-hour workday, sit six hours during an eight-hour workday, and who can occasionally climb, would be able to perform Plaintiff's past relevant work. (R. 55-56.) The VE testified that both of Plaintiff's past work experiences could be performed. (R. 56.)

The ALJ then asked whether an individual with the same age, education, work experience, who can lift and carry 20 pounds occasionally, 10 pounds frequently, stand and walk six hours during an eight-hour workday, sit at least six hours during an eight-hour workday, and occasionally climb, would be able to perform Plaintiff's past work. The VE once again affirmed that the individual would be able to perform both of Plaintiff's past jobs. *Id.* The ALJ asked then asked if the VE's answer would change if the individual was able to lift to 10 pounds occasionally and less than 10 pounds frequently. (R. 56.) The VE testified that the individual would be able to perform both of Plaintiff's past jobs. *Id.* The ALJ then asked if that would be the case if the individual required time to sit and stand to adjust to the pain. (R. 56-57.) The VE stated that the individual could still perform both jobs. (R. 57.)

The ALJ then asked if the individual would be able to perform both jobs if the individual was limited to two to three steps, simple repeated and routine tasks at

the medium exertion level. *Id.* The VE testified that the individual would not be able to perform Plaintiff's past relevant jobs, but that other appropriate positions also existed in the national economy, such as janitorial, laundry worker, and kitchen helper positions. (R. 57.) The ALJ then asked what jobs are available in the national economy if the individual could perform light work, with a repeated routine that incorporated two or three additional steps into the work. The VE opined that an individual would be able to perform the responsibilities of office helpers, information clerks, and mailroom clerks. (R. 57-58.) The ALJ then asked the VE whether an individual with a sedentary RFC but with the ability to sit and stand and perform simple routine tasks involving two or three steps would be able to perform Plaintiff's past relevant work. (R. 58.) The VE stated that appropriate types of positions for that individual would be address clerk and order clerk. *Id.* The ALJ then asked whether an individual who would be on task 20 percent of the workday due to interfering pain and needing to take naps would be able to perform any jobs in the national economy. The VE opined that it would preclude all competitive employment. (R. 59.)

E.    **ALJ Decision**

The ALJ found that Plaintiff met the insured status requirements through December 31, 2012. At the first step, the ALJ found that Plaintiff has not engaged in substantial gainful activity since the alleged onset date of May 1, 2008. *See* 20 C.F.R. § 404.1571 *et seq.* (R. 21.) At the second step, the ALJ found that Plaintiff

had the severe impairments of fibromyalgia and adjustment disorder. *Id.* The ALJ further opined that, although there were isolated references to other medical conditions on the record, those conditions were non-severe. (R. 21.) At the third step, the ALJ found that Plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. § Pt. 404, Subpt. I, App. 1. *Id.* At the fourth step, the ALJ found that Plaintiff has the RFC to perform sedentary work as defined by 20 C.F.R. § 404.1567(a) with certain limitations. The ALJ found that the Plaintiff could only occasionally climb, balance, stoop, kneel, crouch or crawl, and needed the option to stand for one to two minutes after sitting for 45 minutes. The ALJ also limited the Plaintiff to performing simple, routine two- to three-step repetitive tasks. Finally, at step five, the ALJ concluded that Plaintiff would be unable to perform any past relevant work. (R. 26.) However, after considering Plaintiff's age, education, work experience, and RFC, the ALJ determined that there were jobs that existed in significant numbers in the national economy that Plaintiff could perform. Accordingly, the ALJ found that Plaintiff was not disabled. (R. 27.)

## DISCUSSION

## I. ALJ LEGAL STANDARD

To qualify for disability insurance benefits, a claimant must be under a disability within the meaning of the Social Security Act ("The Act"). 42 U.S.C. § 423(a)(1)(E). A disability is defined as the "inability to engage in any substantial

gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see also Barnhart v. Walton*, 535 U.S. 212, 217-22 (2002). Pursuant to the Act, a claimant is disabled only if his physical or mental impairments are of such severity that he is unable to do his previous work and cannot, when "considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work." 42 U.S.C. § 423(d)(2)(A).

In order to determine whether a claimant is disabled, the ALJ considers the following five questions in order: (1) Is the claimant presently unemployed? (2) Does the claimant have a severe impairment? (3) Does the impairment meet or medically equal one of a list of specific impairments enumerated in the regulations? (4) Is the claimant unable to perform her former occupation? and (5) Is the claimant unable to perform any other work? 20 C.F.R. § 416.920(a)(4). An affirmative answer at either step 3 or step 5 leads to a finding that the claimant is disabled. *Young v. Sec'y of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992). A negative answer at any step, other than at step 3, precludes a finding of disability. *Id.* The claimant bears the burden of proof at steps one through four. *Id.* Once the claimant shows an

inability to perform past work, the burden then shifts to the Commissioner to show the claimant's ability to engage in other work existing in significant numbers in the national economy. *Id.*

## II. JUDICIAL REVIEW

Because the Appeals Council denied review, the ALJ's findings constitute the final decision of the agency. *Herron v. Shalala*, 19 F.3d 329, 332 (7th Cir. 1994). Judicial review of the ALJ's decision is limited to determining whether the ALJ's findings are supported by substantial evidence or based upon legal error. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000); *see also* 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). This Court may not substitute its judgment for that of the Commissioner by reevaluating facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility. *Skinner*, 478 F.3d at 841; *see also Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008) (holding that the ALJ's decision must be affirmed even if "'reasonable minds could differ'" as long as "the decision is adequately supported") (citation omitted). "In rendering a decision, an ALJ 'must build a logical bridge from the evidence to his conclusion, but he need not provide a complete written evaluation of every piece of testimony and evidence.'" *Pepper v. Colvin*, 712 F.3d 351, 362 (7th Cir. 2013) (quoting *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir.2005)).

## III.   ANALYSIS

Plaintiff argues that the ALJ erred in her decision because she did not give adequate consideration to the reports of Plaintiff's treating physicians in multiple ways and erred in her determination of Plaintiff's credibility. As described below, however, the ALJ did not err on any of these points, and her decision is therefore affirmed.

### A.   Consideration of Plaintiff's Treating Physicians' Reports

Plaintiff raises arguments related to the ALJ's consideration of various medical opinions of record. These arguments condense in large part to a claim that the ALJ failed to adequately address the treatment notes of Dr. Goodman and—because Goodman's notes were consistent with the notes of other treating physicians—failed to adequately weigh those opinions as well. However, because the ALJ adequately considered Dr. Goodman's opinion and the weight to be given to the other physicians' opinions, there was no error.

#### 1.   The ALJ's Consideration of Dr. Goodman's Treatment Notes

Plaintiff's main complaint is with the ALJ's "scant discussion of Dr. Goodman's treatment notes." (Pl.'s Mem. at 11.) Plaintiff does not argue that the ALJ erred in the weight it gave to any opinion of Dr. Goodman; instead, she contends that the ALJ selectively considered Dr. Goodman's treatment notes by failing to explicitly acknowledge in her decision instances where Plaintiff reported that her medications did not help with pain management and when that she needed

to lie down several times during the day to relieve her pain. The Seventh Circuit has specified that an "ALJ may not analyze only the evidence supporting her ultimate conclusion while ignoring the evidence that undermines it." *Moore v. Colvin*, 743 F.3d 1118, 1123 (7th Cir. 2014). Instead, "[t]he ALJ must confront the evidence that does not support her conclusion and explain why that evidence was rejected." *Id.* But an ALJ need not "discuss every piece of evidence in the record and is prohibited only from ignoring an entire line of evidence that supports a finding of disability." *Jones v. Astrue*, 623 F.3d 1155, 1162 (7th Cir. 2010).

The record in this case demonstrates that the ALJ gave appropriate consideration to Dr. Goodman's treatment notes. Although the ALJ may not have specifically cited to all of the times in which Plaintiff complained of increased pain or the need to lie down to Dr. Goodman, the ALJ in her opinion specifically stated that she had considered the treatment notes identified by Plaintiff, and she discussed both those notes and Dr. Goodman's conclusions arising from them in her opinion. (R. 24.) Furthermore, the ALJ discussed her reasons for discounting Goodman's opinion, (R. 24), which Plaintiff does not challenge. In this case, the ALJ's omissions do not "constitute an entire line of evidence that would support a finding of disability." *Compton v. Colvin*, No. 11 C 8305, 2013 WL 870606, at *15 (N.D. Ill. Mar. 7, 2013). Furthermore, the notes from Dr. Goodman which Plaintiff references reflect instances where Dr. Goodman recorded Plaintiff's subjective complaints as to her pain, (R. 261-62, 272, 369-70, 349-50, 343, 456-57, 840-41, 859-

60, 862-63), and "a doctor's notation in his notes of a claimed symptom or subjective complaint from the patient is not medical evidence; it is the 'the opposite of objective medical evidence.' " *Masters v. Astrue*, 818 F. Supp. 2d 1054, 1067 (N.D. Ill. 2011) (quoting *Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir.2010)). Therefore, this evidence does not change the ALJ's medical conclusions. The ALJ did not err in respect to his evaluation of Dr. Goodman's notes.

### 2. The Opinion of Dr. Park

Plaintiff next argues that the ALJ erred in declining to give controlling weight to the opinion of her longstanding treating physician Dr. Park. The treating physician rule requires ALJs to give controlling weight to a treating physician's opinion if it is both "well-supported" and "not inconsistent with the other substantial evidence" in the record. 20 C.F.R. § 404.1527. If the ALJ declines to do so, then he must offer "good reasons for discounting the opinion" in light of the following regulatory factors: (1) the length, nature, and extent of the treatment relationship; (2) the frequency of examination; (3) the physician's specialty; (4) the types of tests performed; and (5) the consistency and support for the physician's opinion. *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010); 20 C.F.R. § 404.1527.

Plaintiff focuses her argument as to Dr. Park's opinion on the ALJ's failure to fully consider Dr. Goodman's notes as described above: she contends that the ALJ "could not adequately evaluate Dr. Park's opinion without giving full consideration to Dr. Goodman's treatment notes, because Dr. Goodman's treatment notes

constitute the bulk of the medical evidence in the record." (Pl.'s Mem. at 12.) On this

point, however, Plaintiff is incorrect: as described above, the notes from Dr.

Goodman that Plaintiff references merely reflect instances where Goodman

recorded Plaintiff's subjective complaints as to her pain, which is not medical

evidence. *Masters*, 818 F. Supp. 2d at 1067. And even were the notes to constitute

medical evidence, Plaintiff's argument that the ALJ overlooked the notes is without

merit as discussed above.

Plaintiff also contends that the ALJ should have credited Dr. Park's opinion

that "Plaintiff could not function in a competitive work setting due to her pain and

the effects of her medications." (Pl.'s Mem. 12.) This, however, is a conclusion

reserved to the commissioner, rather than a medical conclusion, and was due no

deference. *See* 20 C.F.R. § 404.1527(d)(1); *Denton v. Astrue*, 596 F.3d 419, 424 (7th

Cir. 2010) ("[T]he ALJ is not required to give controlling weight to the ultimate

conclusion of disability—a finding specifically reserved for the Commissioner.").

Plaintiff's arguments aside, the ALJ correctly analyzed Dr. Park's opinion

when deciding the weight it was due. The ALJ analyzed the medical evidence in the

record and declined giving Dr. Park's medical opinion controlling weight due to the

lack of objective evidence supporting the severity of Plaintiff's pain, such as the

unremarkable findings of the MRI, CT scan, MEE, and various laboratory workups,

(R. 24-25), which is a proper consideration. *See* 20 C.F.R. § 404.1527(c)(3). The ALJ

also noted that Dr. Park's opinion was contrary to the consulting physician's

opinion, which was another proper consideration. *Id.* § 404.1527(c)(4). Although Plaintiff argues that it was error for the ALJ to use the consulting physician's opinion in declining to give Dr. Park's opinion controlling weight, the court rejects Plaintiff's argument. The Seventh Circuit has specified that "a contradictory opinion of a non-examining physician does not, *by itself*" provide a sufficient basis for the ALJ to deny a treating physician's opinion controlling weight. *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003) (emphasis added). In this case, however, the ALJ correctly noted that the treating physician's report was contradicted by medical evidence in the record which provided an additional basis for denying Dr. Park's opinion controlling weight; accordingly, there was no error. *See Henriksen v. Astrue*, No. 07 C 6142, 2008 WL 4155175, at *8 (N.D. Ill. Sept. 9, 2008) ("If the non-examining physician's opinion . . . is consistent with other medical evidence in the record, then there is evidence in the record beyond the non-examining physician's opinion that is contrary to the treating physician's opinion, thereby undermining the treating physician's assessment.") (citing *Hofslien v. Barnhart*, 439 F.3d 375, 377 (7th Cir.2006)). The ALJ did not err in her assessment of Dr. Park's opinion.

### 3. The Opinions of Drs. Kokbie and Borchardt

Plaintiff similarly asserts that the ALJ's rejection of Dr. Kokbie and Dr. Borchardt's medical opinions was flawed because the ALJ did not weigh their opinions against Dr. Goodman's extensive treatment notes, which she argues is

required by SSR 96-2p. The Plaintiff, however, provides no argument as to how the ruling requires such an analysis and, after a careful reading, it is impossible to discern where the Plaintiff finds language requiring such an analysis. The Court, therefore, could consider the arguments as to Drs. Kokbie and Borchardt waived. *See Carter v. Astrue*, 413 F. App'x 899, 906 (7th Cir. 2011) ("[I]t is not this court's responsibility to research and construct the parties' arguments, and conclusory analysis will be construed as waiver.") (quoting *Gross v. Town of Cicero, Ill.*, 619 F.3d 697, 704 (7th Cir.2010)); *see also Johnson v. Apfel*, 189 F.3d 561, 562 (7th Cir. 1999) (discussing waiver in social security context).

Even if not waived, however, the ALJ did not err in her assessment of the opinions of Drs. Kokbie and Borchardt. As described above, Dr. Goodman's treatment notes which reflected Plaintiff's subjective complaints were not medical evidence which would have changed the opinions of either physician. And the ALJ otherwise adequately evaluated the opinions. The ALJ noted that Dr. Kokbie had treated Plaintiff only two times, *see* 20 C.F.R. § 404.1527(c)(2), and that—while Dr. Kokbie's indicated that Plaintiff had limitations in reaching, handling, and fingering in both left and right hands, (R. 834-35), the sections of indicating difficulties with handling objects and reaching were largely incomplete, and indicated that Dr. Kokbie did not perform an evaluation of Plaintiff in many respects, and did not otherwise specify the basis for those conclusions. *See* 20 C.F.R. § 404.1527(c)(3). With respect to Dr. Borchardt's opinion, (R. 857-58), the ALJ also

rightfully denied significant weight. First, the ALJ declined to do so because Dr. Borchardt, as a psychologist, was offering an opinion regarding Plaintiff's physical symptoms outside of her area of specialization, *see* 20 C.F.R. § 404.1527(c)(5); *Elder*, 529 F.3d at 416 (noting relevant specialist regarding fibromyalgia as rheumatologist and finding ALJ correctly denied non-rheumatologist controlling weight). The ALJ also appropriately declined to do so because Dr. Borchardt had failed to offer evidence or clinical findings to support her opinion, *see* 20 C.F.R. § 404.1527(c)(3), and because her conclusion that Plaintiff was unable to work was a determination of disability reserved to the Commissioner. *Denton*, 596 F.3d at 424. The ALJ did not err in her analysis of the opinions of Drs. Kokbie and Borchardt.

### B.     The ALJ's Credibility Determination

Plaintiff also challenges the ALJ's credibility finding on a number of grounds. She first argues that the ALJ erred when she deemed Plaintiff's pain management care conservative. An ALJ's credibility determination is granted substantial deference, and will be affirmed so long as it finds some support in the record and is not "patently wrong." *Schmidt*, 496 F.3d at 843 (quoting *Jens v. Barnhart*, 347 F.3d 209, 213 (7th Cir. 2003)). However, an ALJ must reasons for discrediting a claimant which are supported by record evidence and which are "sufficiently specific to make clear to the individual and any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539–40 (7th Cir. 2003)

(quoting SSR 96-7p, 1996 WL 374186). When assessing the credibility of an individual's statements, an ALJ must consider several factors "such as the claimant's daily activities, level of pain or symptoms, aggravating factors, medication, treatment, and limitations and justify the finding with specific reasons." *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009) (citing 20 C.F.R. § 404.1529(c) and S.S.R. 96–7p, 1996 WL 374186).

Plaintiff argues first that the ALJ erred by determining that her course of treatment was "conservative" and contends that her pain stimulator implantation is evidence otherwise. It is true that Plaintiff received the stimulator implant sometime before her alleged onset of disability, and the Seventh Circuit has noted in some circumstances that implantation of a stimulator device does add credibility to a claimant's complaints as to the severity of pain. *See Carradine v. Barnhart*, 360 F.3d 751, 755 (7th Cir. 2004). However, Plaintiff provides no authority to support her position that simply undergoing the procedure *requires* an ALJ to credit a claimant's statements, a position which would be contrary to the Seventh Circuit's past cases. *See Moore*, 743 F.3d at 1125-26 (concluding that "extensive evidence of chronic debilitating migraines, including recognition of that problem by all treating physicians" and surgical treatment with "subcutaneous occipital nerve stimulator" supported claimant's allegations of symptoms, but noting that "[t]hat does not mean that the ALJ was required to credit [claimant's] testimony."). Instead, the ALJ adequately addressed the evidence and found the whole of Plaintiff's course of

treatment not to support her allegations as to the severity of her symptoms. As the ALJ noted, the stimulator was implanted prior to Plaintiff's alleged onset of disability, after which she continued to work and reported a controlled level of pain. (R. 24.) Furthermore, the ALJ addressed Plaintiff's other procedures, such as cervical facet joint injections and medial branch block injections, which are treatments that in other cases have been described as "conservative." *See, e.g.*, *Simila v. Astrue*, 573 F.3d 503, 519 (7th Cir. 2009) (affirming adverse credibility finding based on "relatively conservative" treatment consisting of "various pain medications, several injections, and one physical therapy session"); *cf. Olsen v. Colvin*, 551 F. App'x 868, 875 (7th Cir. 2014) (discussing "epidural steroid injections" and noting that "those injections have been characterized as 'conservative treatment.' ") (citing *Singh v. Apfel*, 222 F.3d 448, 450 (8th Cir.2000)). And the ALJ noted that the majority of Plaintiff's other treatment consisted of regular management of her prescription medications. (R. 24.) Given the deference due to credibility determinations, *see Simila*, 573 F.3d at 517, the ALJ did not err when he described Plaintiff's treatment as "conservative" in this case.

The ALJ's credibility determination was also supported by other substantial evidence. First, the ALJ correctly considered not just the nature of Plaintiff's treatment but also the results of that treatment. *See* SSR 96-7p, 1996 WL 374186; *Buchholtz v. Barnhart*, 98 Fed. App'x. 540, 544 (7th Cir. 2004) (discussing factors to be evaluated in credibility determination, including "medical evidence from treating

physicians and third parties," "medical evidence and laboratory findings," and "course of treatment"). In doing so, the ALJ found that Plaintiff's treatment—including injections and medication—was successful in reducing her pain, a finding which was supported by the record. (R. 24; 256, 257, 843.) And the ALJ noted that, during her subsequent visits to Dr. Goodman, Plaintiff generally reported that her pain remains the same or that the frequency of pain has decreased. (R. 269, 369.) The ALJ also discussed the objective medical evidence that did not support the alleged severity and disabling effect of Plaintiff's pain. Once again the ALJ referred to the MRI, CT scan of the head, EEG, and the laboratory workup which were noted to have returned unremarkable results. The ALJ also discussed Plaintiff's examination with her physicians, who found Plaintiff had a normal gait, normal motor strength, normal sitting posture, and normal behavior. (R. 24-25.) The ALJ referred to the assessment of the agency consultative examiner that concluded Plaintiff "had full normal range of motion in all joints, no tenderness or swelling in the extremities, normal reflexes, no difficulty with hand movements, 5/5 muscle power, 5/5 grip strength, normal coordination, and walked without assistance," (R. 25, 398-401). While the ALJ may not reach a credibility determination solely because the plaintiff's complaints as to pain are unsupported by objective medical evidence, that evidence is nonetheless relevant to reaching a credibility determination. *See Simila*, 573 F.3d at 519 (noting that case law "does not imply that an ALJ can never consider the lack of objective evidence in rejecting a

claimant's subjective complaints" because "[s]uch a reading would nullify 20 C.F.R. § 404.1529(c)(2) and (4)"). Considered together with the ALJ's evaluation of other factors affecting Plaintiff's credibility, the ALJ did not err.

Plaintiff also other challenges the ALJ's credibility determination on other grounds. First, she repeats her allegations as to the consideration of Dr. Goodman's treatment notes when challenging the ALJ's credibility assessment. She argues that "[t]he ALJ's credibility determination is also problematic because of the ALJ's scant consideration of the Dr. Goodman's treatment notes." (Pl.'s Mem. at 13.) But, as described above, the ALJ did not ignore these notes, but simply chose not to assign them the weight which Plaintiff desires, given his consideration of the totality of the evidence. As discussed above, the ALJ need not address every piece of evidence, *Jones*, 623 F.3d at 1162, and the Court "do[es] not reweigh the evidence or substitute [its] own judgment for that of the ALJ." *Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012). Furthermore—other than stating that the ALJ overlooked the notes, which the ALJ did not—Plaintiff provides no additional argument on this point. The ALJ did not err in her consideration of Dr. Goodman's treatment notes in regard to assessing Plaintiff's credibility.

Next, Plaintiff argues that the ALJ erred when she discredited Plaintiff's allegations as to the extent of her symptoms related to fibromyalgia because the ALJ relied on negative MRI findings, but this argument is without merit. It is true that relying on negative MRI findings alone to determine credibility as to the extent

of impairment due to fibromyalgia would be erroneous, as "there are no laboratory tests for the presence or severity of fibromyalgia." *Sarchet v. Chater*, 78 F.3d 305, 306 (7th Cir. 1996); *see also* SSR 12-2p, 2102 WL 3104869, at *2-3 (describing diagnostic criteria for fibromyalgia). However, the ALJ made reference to Plaintiff's 'MRI generally, and not specifically in assessing her claims of pain related to fibromyalgia. (R. 24.) Furthermore, in determining Plaintiff's credibility, the ALJ went on to adequately consider "other evidence" as described above. *See* 20 C.F.R. § 404.1529(a); SSR 96-7p. The ALJ did not err in this respect. *See Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000); *Holmes v. Astrue*, No. 08-CV-338-BBC, 2008 WL 5111064, at *8 (W.D. Wis. Dec. 3, 2008) (affirming decision where "the administrative law judge did not reach her credibility determination solely because of the lack of objective tests confirming the diagnosis of fibromyalgia" but, "[t]o the contrary, she relied upon a number of other factors").

Finally, Plaintiff—again without citation to authority—criticizes the ALJ for discrediting Plaintiff's complaints as to her inability to concentrate, arguing that the ALJ improperly considered her completion of college courses and her history of skilled work—both of which occurred prior to Plaintiff's alleged onset of disability— in finding her not credible. (Pl.'s Mem. at 14.) This contention, however, is simply not accurate: while the ALJ did in fact make such assertions, she did so when assessing the severity of Plaintiff's mental impairments at steps two and three, (R. 22), a determination separate from the RFC determination where credibility is at

issue. *See* 20 C.F.R. § 1520a(d); *Pepper*, 712 F.3d at 366. Plaintiff, however, makes no argument with respect to the ALJ's decision at step three. And, even had the ALJ's consideration of this evidence been erroneous and occurred during a discussion of Plaintiff's credibility, it would not require a remand. "The credibility determination need not be flawless, and will be reversed only if is 'patently wrong,'" *Masters v. Astrue*, 818 F. Supp. 2d at 1065 (quoting *Jones*, 623 F.3d at 1162) (internal citations omitted), which occurs "only when the ALJ's determination lacks any explanation or support." *Elder*, 529 F.3d at 413. In this case, where the ALJ's credibility determination was otherwise adequately supported as described above, any error on this point would not render the decision "patently wrong."

## CONCLUSION

For the aforementioned reasons, Plaintiff's motion for summary judgment [15] is denied.


**SO ORDERED.**                                    **ENTERED:**


**DATE:    February 2, 2016**                    _____
                                                  **HON. MARIA VALDEZ**
                                                  **United States Magistrate Judge**